937 So.2d 1065 (2005)
Willie Earl SCOTT
v.
STATE of Alabama.
CR-02-0347.
Court of Criminal Appeals of Alabama.
February 25, 2005.
On Return to Remand May 27, 2005.
Rehearing Denied September 16, 2005.
Certiorari Denied February 17, 2006.
*1068 Talitha Powers Bailey, Birmingham; and John Charles Robbins, Birmingham, for appellant.
Troy King and William H. Pryor, Jr., attys. gen., and Anne C. Adams, asst. atty. gen., for appellee.
Alabama Supreme Court 1050013.
COBB, Judge.
Willie Earl Scott was convicted of murder made capital because it was committed during the rape of 10-year-old Latonya Sager, § 13A-5-40(a)(3), Ala.Code 1975; murder made capital because the victim was under 14 years of age, § 13A-5-40(a)(15), Ala.Code 1975; first-degree rape of Landris Wright, § 13A-6-61, Ala.Code 1975; burglary in the first degree, § 13A-7-5, Ala.Code 1975; and attempted murder of Landris Wright, §§ 13A-6-2 and -4-2, Ala.Code 1975. The jury recommended by a vote of 10-2 that the death penalty be imposed. The trial court sentenced Scott to death.
The evidence presented at trial tended to establish the following. Willie Earl Scott (Scott), who was 19 years old at the time, lived with his grandmother. Latonya Sager, the 10-year-old murder victim, also lived in the house, as did her younger sister and their mother, Latrice Sager. Latrice's brother, Albert, his girlfriend, Shaneka Scott, and their two children lived there, too. Shaneka and Scott are cousins. During the evening of September 10, 1999, Latrice went to her mother's house to play cards; Latonya accompanied her mother. Latrice and Latonya returned home at approximately 1:30 a.m. on September 11, 1999. While they were driving home, they saw Scott walking near the house. Latonya and Latrice went to the basement of the house, where their bedrooms were located. Latonya told her mother that she was very tired, and she went into her bedroom. Latonya was wearing her school uniform, which consisted of a white shirt and blue shorts; she was wearing panties and blue slippers, too.
Latrice went into her own bedroom and placed a handgun and some jewelry on the ironing board. She then took a bath. When she came out of the bathroom, she saw Scott come into the house through the garage entrance he regularly used. He ran upstairs into the house. Latrice testified that Scott was playing rap music on the radio in the kitchen. Latrice told Latonya to go upstairs and turn on the air conditioning, which she did. Latonya and Latrice retired to their bedrooms for the night. During the night, Scott's grandmother got up and saw Scott driving away in a Lexus automobile that had been parked outside the house.
On the following morning Albert was attempting to locate a broom downstairs. Latrice told him to look in Latonya's room. The door to Latonya's room was locked and when Albert knocked on the door, Latonya did not answer. Albert removed the doorknob and entered the room with Latrice. Latonya appeared to be sleeping on her stomach and was partially covered by a sheet. Latrice touched Latonya's *1069 foot and discovered it was cold. Latonya was dead. Latrice later realized that her gun was missing from her bedroom and that the Lexus was missing from the driveway.
Dr. Bruce Alexander performed the autopsy on Latonya's body. He stated that Latonya weighed 64 pounds and was slightly more than four and one-half feet tall. The doctor observed that Latonya's lower lip was bruised and she had an abrasion or a scratch on her neck. The doctor discovered small hemorrhages in the whites of her eyes, which are consistent with asphyxiation. He discovered extensive hemorrhaging beneath Latonya's vocal cords and her larynx, as well as below her lower left eyelid. The doctor observed extensive swelling of Latonya's brain and hemorrhaging in the area behind the brain. The doctor concluded that the cause of death was asphyxiation with strangulation and possibly also with suffocation. (R. 619.)
Dr. Alexander also observed a shiny substance around Latonya's pubic area and inside both of her thighs. That material was collected and analyzed at a laboratory. The results of the analysis revealed the substance to be semen. The semen on Latonya's right inner thigh contained Scott's DNA. (R. 714-17.) The doctor took oral, anal, and vaginal swabs and discovered no sperm in any of the tested areas.
Also on the evening of September 10, 1999, Landris Wright had spent the night with her aunt, Gladys Wright Smith; Smith's residence was located less than 10 miles from the residence where Latonya Sager was murdered. Wright and Smith testified that a "peeping Tom" had looked into the bedroom window at approximately 3:20 a.m., and Smith had twice reported the "peeping Tom" to the police that night. At approximately 6:00 a.m. on the morning of September 11, 1999, Scott pushed his way into Smith's home, waving a gun. Smith and Wright were acquainted with Scott, but they had not invited him into the apartment that morning. Smith testified that Scott was acting "weird," so she convinced him to leave the residence and to go with her to a nearby restaurant where she worked. (R. 438-39.) Scott drove to the restaurant in a Lexus automobile.
Scott left the restaurant soon after he arrived there. Fearing for Wright's safety because Scott had left, Smith called Wright and told her to check the doors and the windows in the apartment to be sure they were locked. She also told Wright not to let Scott into her home. Wright did not check the doors because her aunt usually locked them herself. Scott returned to Smith's apartment at approximately 7:00 a.m., while Wright was taking a shower. Wright testified that, when she got out of the shower, Scott threw her on the bed and choked her. The two struggled; Scott had a gun in his hand. Scott raped Wright.
Scott then made Wright go into the bathroom where he forced her head into the toilet and put a pillow against the back of her head. He put a bullet in the chamber of the gun and told Wright he was going to blow her brains out. Scott forced Wright to bathe in the tub for approximately an hour. He then raped her a second time. She said that after he raped her again, he again forced her head into the toilet and then made her get into the tub. While she was in the bathtub, he brought some vinegar from the kitchen and poured it into the bath water. He made Wright clean herself in the bathtub.
Wright said that, after she got out of the tub, Scott made her sit on the bedroom floor. He told her that he had killed a girl on the night before. He also told her that he had killed a boy over drugs and that he *1070 had raped another girl. Scott then told Wright to lie on the bed with him. He put his leg across hers so that she could not move and then he fell asleep. When she was certain that Scott was asleep, she ran from the house to a nearby store, where someone flagged down police officers who were in the area.
The police took Wright to Smith's residence and made her wait outside while they went into the house. The police brought Scott out and Wright heard Scott cursing and hollering. She testified that Scott said he would be out of jail the next day. He also attempted to spit on Wright and he threatened to "chop up" her brother. (R. 377-78.) Wright's mother testified that her daughter placed a frantic telephone call to her after she escaped from the house, and she and two of her children drove to Smith's house. She, too, said that when Scott was brought out of the house, he was screaming and saying all kinds of things; he threatened to cut up her son. Wright's mother testified that Scott said, "Y'all tripping about some pussy." (R. 481.)
Officer Terri Jones of the Birmingham Police Department was on patrol in the area of Smith's apartment when she was flagged down outside a business. Landris Wright told her that she had been raped by a man who was asleep inside her apartment. Jones and another officer went into Smith's apartment and located Scott, who was asleep on the bed wearing only his underwear. The officers touched him to awaken him and he jumped out of bed, screamed, and ran around, out of control. He knocked down the blinds covering the window and broke the glass in the window with his head or his elbow, as if he intended to jump out of the window. Wright identified Scott as the man who had raped her. After he was arrested, the police found a handgun beneath the bed.
When the officers asked Scott his name, he stated that his name was George Dwight Goldthwaite. (R. 332.) Two traffic citations were in the pocket of his pants that the officers found on the floor. Scott's name was not on the citations; the name George Dwight Goldthwaite was on the citations. The citations had been issued the night before and were issued in two locations not far from the scene of the rape. Wright said she knew the suspect by the name "Willie Red" or "Willie Earl." Smith later stated that she knew him by the name Willie Earl Scott. (R. 332.) When the officers checked the license plate on the Lexus at the scene, they learned that the vehicle was registered to someone who lived at the house where Latonya Sager had been murdered. While Scott was being transported to the police station, information came over the police radio about Sager's death. Officer Jones testified that Scott began to cry, and he asked, "What happened at my house?" (R. 323.)
Forensic tests revealed no semen or DNA from Scott on any of the swabs taken from Landris Wright, or on the bedsheet collected at the scene. The forensic biologist testified that bathing can diminish the presence of semen, but that it is possible to find semen even after a woman has bathed and douched. (R. 749-52.)
After the State rested its case, the court held an in camera hearing because defense counsel wanted to rest without presenting any witnesses, while Scott wanted to present witnesses who, his attorney believed, would damage his case. After hearing the arguments of defense counsel and his client, the trial court directed defense counsel to call the witnesses to testify.
Charlie May Scott, the defendant's aunt; Bonnie Scott, the defendant's grandmother; and Rachel Hillary testified on Scott's behalf. They provided no substantive testimony *1071 regarding the crimes, although Hillary testified that she saw Scott driving a Lexus after midnight on the night the crimes were committed.
The jury found Scott guilty on all counts, and the trial court adjudicated him in accordance with the guilty verdicts. The court then held a sentencing hearing before the jury. The State presented evidence of Scott's prior conviction for assault.
Scott called as an adverse witness his cousin, Shaneka Scott (Shaneka). Shaneka testified that, during the early morning hours of September 11, 1999, she was at her house, which was also her grandmother's house, where she lived with her husband and their two children. She said that Latrice Sager and her two daughters and the appellant also lived there. Scott often entered the house by way of the garage door, she said; the garage door was near the door to Latonya's bedroom. She said that Latrice and Latonya arrived at the house at approximately 2:00 a.m. on September 11, 1999, and that Scott arrived soon after. Shaneka said that Scott left the house before 2:30, when Latonya went to bed. When Scott left, Shaneka's keys and her car were in her possession. At approximately 3:15 a.m., Shaneka's grandmother woke her up to tell her that her car was missing. Shaneka determined that Scott had returned to the house and had taken her keys and money from her purse and had also taken her car. She acknowledged on cross-examination, however, that she had not checked her purse all day, so she was unsure when Scott took the keys and money from her. Shaneka got up and drove another vehicle around the neighborhood, looking for her car. She drove to an apartment where Scott often spent time, but she was unable to locate her car. She said this was not the first time Scott had taken her car without her permission.
Two of Scott's aunts and his grandmother testified on his behalf.[1] They spoke of their love for Scott and testified about the chaos in his upbringing. Scott testified on his own behalf. He professed his innocence and spoke in rambling way about his dream to be a writer and about his former career as a rap-music artist.
The jury recommended, by a vote of 10-2, that the trial court sentence Scott to death. The trial court thereafter conducted a sentencing hearing. The State presented evidence that Scott had previously been convicted for possession of a controlled substance, and noted that it had previously presented evidence of Scott's prior conviction for assault. Latonya Sager's parents testified about how their daughter's rape and murder had affected them. Scott's cousin, George Copeland, testified that Scott was "a thug and hoodlum" and "a freak" but that he was harmless and was a good-hearted person.
The trial court imposed a death sentence as to each count of capital-murder. The court sentenced Scott to life imprisonment for the rape conviction, the attempted murder conviction, and the burglary conviction. The court also imposed fines and ordered Scott to pay restitution. This appeal followed.

I.
Scott first argues that the trial court erred to reversal when it "interfered" with defense counsel's trial strategy *1072 and ordered counsel to call to the stand three witnesses Scott wanted to testify and who defense counsel believed would be harmful to the case. The State argues that no error occurred when the trial court, after extensive colloquy with Scott, directed counsel to call the witnesses Scott wanted to call; alternatively, the State argues, if the trial court erred, the error does not require reversal because Scott was not prejudiced and any error was therefore harmless. We agree with the State. The trial court devoted extensive time and consideration to this issue; therefore, we will set out in detail the facts relevant to our resolution of the claims Scott raises here.
Before voir dire examination began, Scott personally addressed the court and expressed his desire to have certain witnesses called. He stated:
"I got some witnesses. Right? My attorney refuses to call them, because he feels like they would be committing perjury. You see what I'm saying? I say they ain't. You know what I'm saying? Without them, you know, I don't stand no chance in this case. You see what I'm saying?"
(R. 99.) The court informed Scott that the State would present its case first, so he had time to discuss with his attorneys whether the witnesses would testify. The court assured Scott that he would have an opportunity later to state on the record his reasons for wanting to present the witnesses. (99-101.)
At the close of the State's evidence, defense counsel informed the court that he had advised Scott that they should rest without presenting any evidence. Counsel further stated that it was his understanding that, as an advocate for his client, the decision about which witnesses to call was his, not Scott's. Scott responded, "It's my life. I feel like it's my decision." (R. 785.) Defense counsel stated that he believed that the witnesses Scott wanted to testify would only damage his case; one witness had a capital-murder charge pending against her. Scott explained to the court why he wanted the witnesses to testifyto prove that he had not peeped in the windows of Gladys Smith's apartment in the early morning hours of September 11, 1999. The court spoke with Scott about the witnesses he wanted to call and, after that discussion, Scott said he wanted to call Laquita Edwards and Rachel Hillary. (R. 805-06.) He then added that he wanted his aunt and grandmother to testify. (R. 815-16.)
The court then summarized the discussion, in part, as follows:
"It's already five after 4, and I want the record to reflect that we got back here at 1:30, and I have allowed the defense an opportunity, from 1:30, until five after 4, to talk to their client, and the client's family members, and work out who is going to testify, and who is not, and this, that, and the other. And I think that's more than reasonable and fair."
(R. 817.)
Defense counsel noted his appreciation of the court's time, but then advised the court that it remained his intended trial strategy to call no witnesses. Defense counsel stated that it was Scott's "job" to assist him. Further discussion ensued between the court, defense counsel, Scott, and two of Scott's relatives regarding whether defense counsel should call the witnesses Scott wanted him to call. After much discussion, and with his attorney and his family members advising him against calling any witnesses, Scott again stated that he wanted "to take that chance." (R. 820.) The court advised Scott that she did not want him to later allege that he was confused about this decision or that counsel *1073 did not advise him of the consequences of calling the witnesses.
The court then directed defense counsel to call the four witnesses Scott had requested him to call. Defense counsel stated that he would honor the court's directive, but he objected to being told by his client which witnesses to call. (R. 822.) Defense counsel called the witnesses; three witnesses testified, and the fourth invoked her Fifth Amendment right and declined to testify.
After the parties rested, defense counsel renewed his motion for a judgment of acquittal. He then made a motion for a mistrial, stating that the trial court's order to call certain witnesses, at his client's request, was error and was grounds for a mistrial. (R. 870.) The court then stated to Scott, "I am saying you wanted me to put [the witnesses on the stand], and because you wanted me to do it, we put them there. Is that right?" Scott replied, "You are, basically, right." (R. 872.) The trial court denied the motion for a mistrial. Defense counsel continued to argue that the client should not be permitted to direct matters of trial strategy because those matters were for trial counsel to decide. The court declined to alter its ruling.
After the attorneys presented their closing arguments to the jury, defense counsel renewed his motion for a mistrial. He alleged that the prosecutor in his closing argument had commented on the testimony of the defense witnesses that had been prejudicial to Scott; defense counsel also stated that he had earlier argued to the court that the witnesses would not be helpful to Scott's case and that they should not be called. He again argued that a defendant should be consulted but should not have the final decision on whether to call a particular witness. The trial court stated that it had thoroughly discussed the issue with the parties on the previous day and that Scott had made the decision to go forward with the witnesses. The court denied the motion for a mistrial. (R. 940.)
On August 19, 2002, the day the sentencing hearing before the jury was held, defense counsel filed a "Renewed Motion for A Mistrial," challenging the court's decision to require him to call the witnesses Scott had requested he call. Defense counsel argued that a defendant does not have the right to direct matters of trial strategy; he further alleged that, by directing him to call the witnesses at Scott's request, "the Court second-guessed the tactical decisions of defense counsel, and thereby directed matters of trial strategy." (C. 601-03.) The attorneys argued the merits of the motion and the trial court denied it. (R. 1010-14.)
On November 4, 2002, defense counsel filed a motion for a judgment of acquittal or a new trial. (C. 311-314.) He alleged, among other things, that the court erred when it allowed Scott to decide matters of trial strategy, specifically, which witnesses to call on his behalf. He also alleged that, by allowing Scott to decide matters of trial strategy and by ignoring defense counsel's decisions regarding witness presentation, "the trial court overstepped its judicial role and began what is tantamount to giving the Defendant legal advise [sic] during the trial of his case." (C. 312.) After a hearing on the motion, the trial court denied it. (R. 1165.)
On appeal, Scott argues that the trial court erred when it ordered defense counsel to call the witnesses Scott wanted to appear on his behalf because, he argues, that order interfered with trial strategy, and matters of trial strategy, Scott contends, are to be determined by defense counsel. The trial court's actions did not constitute an unwarranted interference with the attorney-client relationship or with the attorney's trial strategy.
*1074 The State cites Burton v. State, 651 So.2d 641 (Ala.Crim.App.1993), aff'd, Ex parte Burton, 651 So.2d 659 (Ala.1994), in support of its assertion that no error occurred. In Burton, also a capital-murder case, the defendant wanted to call two witnesses during his sentencing hearing that defense counsel did not want to call to the stand. The witnesses testified at the hearing. On appeal, Burton argued that the trial court had interfered with the attorney-client relationship. This Court disagreed and stated:
"The record clearly shows that it was the appellant's wish to call these two witnesses. The court had a lengthy colloquy with the appellant concerning his desire to have his two codefendants testify at the penalty phase of the proceedings. The court, after talking with the appellant, complied with his wishes.
"An attorney represents a criminal defendant and is obliged by Rule 1.2, Alabama Rules of Professional Conduct, to `abide by a client's decisions concerning the objectives of representation....' An attorney can only make recommendations to a client as to how to conduct his defense; the ultimate decision, however, lies with the client. There was no interference with the attorney-client relationship here, when the trial court was honoring the appellant's wishes."
Burton, 651 So.2d at 656.
Our holding in Burton requires us to reject Scott's claim here.[2] As detailed at the beginning of this discussion, the trial court took a vast amount of time resolving the issue whether defense counsel should be required to call the witnesses Scott wanted to have called, just as the court did in Burton. Each time the matter was considered, Scott stated that he wanted the witnesses to testify. Even before the potential jurors were questioned, Scott stated that he wanted certain witnesses called that defense counsel did not want to call. When defense counsel initially presented the matter to the court and told the court that he thought, as counsel, he should determine which witnesses to call, Scott stated, "It's my life. I feel like it's my decision." (R. 785.) Even after the witnesses had testified, when defense objected again to the court's directing him to do as his client had asked, Scott continued to state on the record that he had wanted the witnesses to testify: [Court:] "I am saying you wanted me to put [the witnesses on the stand], and because you wanted me to do it, we put them there. Is that right?" Scott replied, "You are, basically, right." (R. 872.) Thus, like the defendant in Burton, Scott clearly expressed his desire that the witnesses be called. Scott was fully aware that his attorney's advice was directly contrary to his wishes and he was made aware of the reason the attorney did not want to call the witnesses. After considering carefully the arguments of counsel and Scott's expressed wishes, the trial court directed counsel to honor his client's decision. As in Burton, "There was no interference with the attorney-client relationship here, *1075 when the trial court was honoring the appellant's wishes." Burton, 651 So.2d at 656. No error occurred because there was no interference with the attorney-client relationship.
The doctrine of invited error provides additional support for our decision here. "Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby." Phillips v. State, 527 So.2d 154, 156 (Ala.1988). "`A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions.'" Campbell v. State, 570 So.2d 1276, 1282 (Ala.Crim.App. 1990) (quoting Leverett v. State, 462 So.2d 972, 976-77 (Ala.Crim.App.1984)). Slaton v. State, 680 So.2d 879, 900 (Ala.Crim.App. 1995), aff'd, 680 So.2d 909 (Ala.1996). "Invited error has been applied to death penalty cases. `An invited error is waived, unless it rises to the level of plain error.' Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991)." Adams v. State, [Ms. CR-98-0496, Aug. 29, 2003] ___ So.2d, ___, ____ (Ala.Crim.App.2003).
The facts demonstrate without question that Scott chose to ignore the advice of his attorney and to call witnesses on his behalf. Even before the jury was seated, Scott had informed the court that he wanted certain witnesses called and that his attorneys did not want to call them. When the issue was raised during the trial, the trial court questioned Scott thoroughly and ensured that he was aware of counsel's reasons for recommending that the witnesses not be called. Nonetheless, Scott stated, "It's my life. I feel like it's my decision." (R. 785.) Near the end of the lengthy colloquy between the court, Scott, and defense counsel regarding which witnesses Scott wanted called to the stand, when counsel again stated for the record that, as a matter of trial strategy, he did not want to call the defense witnesses, the following occurred:
"THE COURT: Okay. You don't want to call them. Your client, Mr. Scott, wants them called. Is that right?
"THE DEFENDANT: Yes, I do.
"THE COURT: Alright. And you want to override his advice?
"THE DEFENDANT: I mean, from ____ what I mean, it's his job to assist me.
"THE COURT: Okay. So you want to override his advice, and you want these people called.
"THE DEFENDANT: I want to call them, and I want him to be a lawyer to me. That's what I want."
(R. 817-18.)
Some of Scott's family members were in the courtroom, and they expressed their disagreement with Scott's decision to call defense witnesses. After a thorough, lengthy discussion with the trial judge and counsel, Scott continued to express his desire that defense witnesses be called. He cannot now be heard to argue that the trial court erred when it "stepped down from the bench," or "trumped the trial strategy of counsel and interjected herself" into the case. (Scott's brief at p. 11.) The record clearly reveals that the defense witnesses were called at Scott's insistence, over the objection of trial counsel, and without any expression of opinion by the trial court. Even if error had occurred, it would have been invited by Scott.
Scott is not entitled to any relief on this claim.

II.
Scott next argues that the trial court erred when it denied his motion to *1076 continue the case after a necessary witness, Shaneka Scott, failed to respond to the subpoena directing her to appear at his trial. He claims that Shaneka's testimony would have been exculpatory and that she would likely have been located if the case had been continued. The State argues that the trial court did not abuse its discretion when it denied the continuance. Although we believe the better practice would have been for the court to have granted a brief continuance, we nonetheless agree with the State that the denial of the continuance in this case did not constitute an abuse of discretion.
"`A motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion. If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence.'

"Ex parte Saranthus, 501 So.2d 1256, 1257 (Ala.1986) (citations omitted)."
Jackson v. State, 836 So.2d 915, 940 (Ala. Crim.App.1999).
The trial of this cause began on Monday, August 12, 2002, when the jury was struck. Before opening statements, Scott informed the trial court that Shaneka had been subpoenaed by both the prosecution and the defense, but that he might need the court's assistance in securing her attendance. The trial court instructed Scott to work with the court's bailiffs and stated that it would issue whatever writs were necessary to secure Shaneka's attendance at the trial.
At the close of the State's case, on Thursday afternoon, August 15, 2002, Scott stated that, in spite of extensive efforts by law-enforcement officers to take Shaneka into custody, Shaneka had successfully evaded them. He requested a continuance until Monday "to try to run her down" because she was a critical witness. (R. 770.) The court stated that it had assisted him in every way to secure her attendance; Scott agreed. He acknowledged that the bailiff had assisted by giving information to the police and to sheriff's officers, who then followed up on the information and attempted to locate Shaneka and take her into custody. Scott's family members also assisted in the efforts to locate Shaneka. Scott then stated that Shaneka was a necessary witness because she would testify that she let Scott out of the house on the night of the murder and that Latonya was alive when he left.
The prosecutor stated that the Birmingham Police Department and federal marshals had searched for Shaneka for months because state and federal warrants had been issued for her arrest. The prosecutor stated that he, himself, had searched for Shaneka on several occasions. The prosecutor stated that Shaneka had previously told him that Scott had returned to the house during the night and had taken her car keys.
The judge noted that, if Shaneka appeared in court, she would have to take Shaneka into custody because the court record contained at least 8 felony warrants and 10 misdemeanor warrants for her arrest. (R. 779.) The court confirmed with defense counsel that Shaneka had been served with a subpoena and that Shaneka was aware of the outstanding warrants for her arrest. The court stated that its personnel had diligently assisted Scott all week in efforts to locate Shaneka and was *1077 not inclined to grant a continuance at that time.
Scott then presented his witnesses and rested, and the jury was excused for the evening. The trial court told defense counsel to continue to look for Shaneka and if he located her and wanted to put her on the stand, the court would allow him to reopen his case and do so. (R. 850.)
On the following day, Friday, August 16, 2002, Scott renewed his motion for a continuance, requesting that the court give him until Monday to locate Shaneka. He stated that he believed "that, possibly, over the weekend, [the defense team] could locate her" and again stated that she was a critical witness. (R. 858.) The prosecutor stated that he, his cocounsel, and an investigator from the Birmingham Police Department had traveled through Shaneka's neighborhood, had contacted principals at the schools where her children were enrolled, and had gone to her grandmother's house, where her children were staying. He said that, during the past two months, they had gone to at least four different places searching for Shaneka. He said that a local television show, "Crime Stoppers," had featured Shaneka two weeks before trial. The prosecutor stated that federal marshals had been looking for her and that he had actually seen officers in their vehicle with the warrant for Shaneka's arrest in hand, searching for her over the past few months.
The trial court stated that Shaneka had 18 outstanding warrants for her arrest, that everyone had "bent over backwards to try to find her," but that no one had been able to do so. (R. 859.) The court denied the motion for a continuance. Scott stated that he appreciated the court's assistance during the previous days of trial in his attempts to secure Shaneka's presence. He also stated, "I can't guarantee that I could find her over the weekend. I could only hope and try, continue to try." (R. 860.) The trial proceeded and the jury deliberated and rendered its guilty verdicts that day. Shaneka was taken into custody while the jury was deliberating its guilt-phase verdicts. Shaneka testified during the penalty phase of Scott's trial. She stated that Scott left the house on the night of the murder before Latonya went to bed. She acknowledged, however, that she told the police during their investigation that Scott returned to the house after Latonya went to bed. She testified that Scott often entered the house through a garage door near Latonya's bedroom. She also testified that, at 3:19 a.m., she discovered that Scott had taken her car keys and her automobile.
Scott now argues that the trial court erred when it denied his requests for a continuance because Shaneka's testimony would have been exculpatory, because she was likely to have been apprehended that weekend by the many law-enforcement officers searching for her, and because Scott had exercised due diligence in searching for her. We find no abuse of discretion in the trial court's denial of Scott's motion for a continuance.
Ex parte Saranthus, 501 So.2d 1256, 1257 (Ala.1986), requires that the party requesting a continuance establish, among other things, the probability that the evidence or the witness will be forthcoming if the case is continued because a witness is missing. The facts set forth above demonstrate clearly that Scott failed to establish this necessary element. To the contrary, the evidence demonstrated that, in spite of the repeated and diligent efforts made by State and federal law-enforcement officers, by the prosecution team and the defense team, and with the assistance of court personnel during the trial, Shaneka had successfully evaded capture for months. *1078 Nothing presented to the court indicated, at the time the motion was made, that additional efforts would yield a different result and that Shaneka would soon be taken into custody. In fact, although defense counsel raised this issue again in his motion for a new trial, he conceded that the record was clear that, when he requested the continuance, he "could not, in good conscience, assure the Court that we would, if [the court] had put it over to Monday, that we could have gotten Shaneka." (R. 1153.) The prosecutors and state and federal law-enforcement officers had searched for Shaneka for months and they went to extremes to locate her. The prosecutor himself attempted to locate Shaneka several times. Shaneka was featured on "Crime Stoppers," a local television show which solicits tips from citizens to assist in apprehending fugitives. We believe that the attempts to locate Shaneka far exceeded the attempts to locate the fugitives in other cases.
Although the better practice might have been for the trial court to have granted the continuance, we cannot find, based on the facts before us, that the trial court abused its discretion when it denied the motion for a continuance. Scott is not entitled to any relief on this claim.

III.
Scott next argues that the trial court erred when it failed to sever the capital-murder charges involving Latonya Sager from rape and attempted-murder charges involving Landris Wright. He claims that the charges were improperly joined for trial and that he was prejudiced as a result of having to defend against the multiple charges in a single trial.
Scott was charged in three indictments. One indictment charged two counts of capital murder for the death of Latonya Sagerone count for the intentional murder of a child under the age of 14 years and one count for intentional murder during the course of, or during an attempt to commit, rape. In a second indictment, Scott was charged with one count of rape and one count of attempted murder for his assault on Landris Wright. The third indictment charged him with burglary for Scott's unauthorized entry into Gladys Smith's residence. On July 28, 2000, the State filed a motion pursuant to Rule 13, Ala. R.Crim. P., seeking consolidation of the offenses. The State argued that the actions were part of a common plan or scheme, that they were connected, and that they were of the same or similar character. (C. 466-67.) The trial court granted the motion. On the morning of trial, Scott objected to the consolidation of the cases and requested that the trial court sever the capital charges from the noncapital charges. (R. 97.)[3] The trial court stated that the cases would remain consolidated for trial.
Joinder of offenses is governed by Rule 13.3(a), Ala. R.Crim. P., which provides, in relevant part:
"Two or more offenses may be joined in an indictment, information, or complaint, if they:
"(1) Are of the same or similar character; or
"(2) Are based on the same conduct or are otherwise connected in their commission; or
"(3) Are alleged to have been part of a common scheme or plan."
Rule 13.3(c), Ala. R.Crim. P., provides, in relevant part:

*1079 "If offenses or defendants are charged in separate indictments, informations, or complaints, the court on its own initiative or on motion of either party may order that the charges be tried together or that the defendants be joined for the purposes of trial if the offenses or the defendants, as the case may be, could have been joined in a single indictment, information, or complaint."
Rule 13.4(a), Ala. R.Crim. P., provides that if the defendant is prejudiced by the joinder of offenses the court may grant a severance. "It is only the most compelling prejudice that will be sufficient to show the court abused its discretion in not granting a severance. United States v. Perez, 489 F.2d 51, 65 (5th Cir.1973), cert. denied, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). A mere showing of some prejudice is not enough." Ex parte Hinton, 548 So.2d 562, 566 (Ala.1989).
Scott argues in this Court, as he did in the trial court, that the charges involving Latonya Sager should not have been consolidated with the charges involving Landris Wright because, he argues, the cases were not of the same or similar character, they were not based on the same conduct or were otherwise connected, and they were not part of a common plan or scheme. The State argues that the trial court correctly granted the motion to join the cases because the offenses shared sufficient similarities and because Scott failed to demonstrate any prejudice. We agree with the State.
In Lewis v. State, 889 So.2d 623 (Ala. Crim.App.2003), this Court considered whether capital-murder charges had been properly joined for trial with noncapital murder charges. After discussing the relevant principles regarding joinder, we determined that the trial court had not erred in joining the charges for trial. We held:
"The consolidation of the noncapital offenses and the capital offenses in this case was proper because the crimes were of a similar character and because evidence of each crime would have been admissible in a trial for the others as evidence of a common plan, scheme, or design, of Lewis's intent, and of Lewis's motive. The crimes were similar in that each occurred in Baldwin County near where Lewis lived; each involved a young female victim with brown hair; each involved a murder, robbery, rape, and kidnapping or an attempt thereof; and, in each case, Lewis used or planned to use a knife. Each crime would have been admissible in the trial of the others as evidence of a common plan, scheme, or designto kidnap, rape, rob, and murder young women with brown hair who resembled and/or reminded Lewis of his ex-wife Lenaand of Lewis's intent and motive."
889 So.2d at 661-62.
The cases against Scott were properly joined for many of the reasons we found to apply in Lewis. The crimes were similar in that each victim was acquainted with Scott. Each victim was a young black girl.[4] The crime scenes were approximately 10 miles apart and the crimes were committed within a few hours of each other. In each incident, Scott raped or attempted to rape the victim and he physically assaulted the victims by choking and/or suffocating them. Evidence from the first crime scene was found at the second crime scene, and the police used *1080 evidence from the second crime scene to connect Scott to the death of Latonya Sager. Finally, Scott told his second rape victim that he had killed a girl earlier that evening. The requirements of Rule 13.3(a), Ala. R.Crim. P., were fully satisfied here. Scott has not demonstrated any compelling prejudice as the result of the joinder. The trial court did not abuse its discretion when it joined the charges for a single trial.

IV.
Scott next argues that the trial court erred when it denied defense counsel's pretrial motion to withdraw, in which counsel alleged he and cocounsel had conflicts of interest in representing Scott that could not be resolved. The State contends that the trial court correctly denied the motion because counsel did not offer any proof that an actual conflict existed, nor did they allege that Scott was prejudiced by the alleged conflict. We agree with the State.
On the morning of trial, defense counsel made a motion to withdraw from the case, citing a recently discovered conflict of interest which they could not disclose to the court, they said, due to attorney-client confidentiality. The trial court noted that the crimes had been committed nearly three years earlier, that several continuances had been granted, and that trial was scheduled to begin that day. For those reasons, and because no information about an alleged conflict had been presented, the court denied the motion to withdraw. Defense counsel then stated that they had consulted with an attorney at the Alabama State Bar Association and had been told that they could not disclose to the court the nature of the conflict without violating the Alabama Rules of Professional Conduct. The attorney at the State Bar Association told defense counsel that he was willing to speak with the trial judge; the judge said that she had contacted the attorney and that he had told the judge he could not discuss the matter with her. (R. 87.) At the judge's suggestion, defense counsel then consulted with Scott about waiving the attorney-client privilege so that they could disclose the conflict to the court in camera. Scott declined to do so. The court denied the motion. (C. 48.) The case proceeded to trial.[5] On appeal, Scott argues that, even though no support for the allegation of an alleged conflict was presented to the court, the court should have granted defense counsel's motion to withdraw. He alleges, further, that he should not have been required to waive his attorney-client privilege in order to be represented by an attorney who did not have a conflict.
A trial court has broad discretion in considering whether to grant defense counsel's motion to withdraw. Unless defense counsel establishes an actual conflict of interest or an irreconcilable conflict between counsel and the defendant, the trial court's denial of the motion to withdraw will not be overturned. E.g., Ex parte Bell, 511 So.2d 519, 522 (Ala.Crim. App.1987). We have previously discussed the principles relevant to appellate review of a motion to withdraw.
"`"[T]he decision whether to remove an appointed counsel and appoint another counsel for defendant is within the sound discretion of the trial court." Crawford v. State, 479 So.2d 1349, 1355 (Ala.Cr.App.1985). See also, Tudhope v. State, 364 So.2d 708 (Ala.Cr.App.1978). . . . The right to choose counsel may not be subverted to obstruct the orderly procedure in the court or to interfere with the fair *1081 administration of justice. United States v. Sexton, 473 F.2d 512 (5th Cir.1973).'

"Briggs v. State, 549 So.2d 155, 160 (Ala. Crim.App.1989).
"`In order to prevail on a motion for substitution of counsel, the accused must show a demonstrated conflict of interest or the existence of an irreconcilable conflict so great that it has resulted in a total lack of communication that will prevent the preparation of an adequate defense.' Snell v. State, [723 So.2d 105, 107 (Ala.Crim.App.1998)]. In Wilson v. State, 753 So.2d 683 (Fla.Dist.Ct.App. 2000), a defendant moved to have his counsel dismissed. When asked on what grounds he wished to have his counsel dismissed, the defendant responded that counsel had not conferred with him about the law and that he had lost faith in counsel. The trial court responded that he found defense counsel's performance to have been exemplary; however, "[c]onsistent with his behavior throughout the trial, the defendant refused to remain silent after the trial judge's rulings", supra at 686. The trial court denied the appellant's motion, and the Florida Appellate Court upheld that decision, stating:
"`"[T]rial courts are given broad discretion to determine whether a motion to withdraw should be granted.... The primary responsibility of the Court is to facilitate the orderly administration of justice. In making the decision of whether to grant counsel permission to withdraw, the trial court must balance the need for orderly administration of justice with the fact that an irreconcilable conflict exists between counsel and the accused. In doing so, the Court must consider the timing of the motion, the inconvenience to the witnesses, the period of time elapsed between the date of the alleged offense and trial, and the possibility that any new counsel would be confronted with the same conflict. As long as the trial court has a reasonable basis for believing that the attorney-client relation has not deteriorated to a point to where counsel can no longer give effective aid in the fair presentation of a defense, the Court is justified in denying a motion to withdraw. The decision of a trial court to deny a motion to withdraw will not be disturbed absent a clear abuse of discretion."'

"Wilson v. State, 753 So.2d at 688, quoting Sanborn v. State, 474 So.2d 309, 314 (Fla.Dist.Ct.App.1985) (citations omitted).
"In the present case, the appellant has made no such showing that a conflict of interest or an irreconcilable conflict exists. Although the appellant alleged that his counsel visited him infrequently, he made no showing of a `total lack of communication,' which would have prevented the preparation of a sufficient defense; all the appellant has demonstrated is a possible lack of `a meaningful relationship' or a lack of `confidence in court-appointed counsel,' neither of which is guaranteed him under the United States Constitution or Alabama Constitution 1901. Therefore, the trial court did not abuse its discretion by failing to substitute or remove court-appointed counsel and appoint a new counsel for the appellant."
Baker v. State, 906 So.2d 210, 226-27 (Ala. Crim.App.2001), rev'd on other grounds, 906 So.2d 277 (Ala.2004).
Scott contends that an actual conflict of interest existed. Defense counsel presented no evidence to support this assertion *1082 when they filed the motion to withdraw, and they did not present any evidence in support of this claim during the hearing on the motion for a new trial. In fact, when defense counsel raised the issue in the motion for a new trial, they stated that they had moved to withdraw "because of the conflict that was created, not bynot by anyone other than the defendant, himself. He created a conflict, not byit wasn't created by the Court, it wasn't created by the State, but it was created by the defendant and some potential witnesses." (R. 1152-53.)
As the State has argued, Scott failed to demonstrate either that a conflict of interest existed or that the alleged conflict adversely affected counsel's performance. Without such proof, Scott has failed to establish a constitutional violation. Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).
Furthermore, the motion to withdraw was made on the morning of trial, after nearly three years had passed from the date of the crimes; without question, the witnesses who had appeared for trial would have been inconvenienced if the motion had been granted. Finally, because Scott failed even to allege any facts regarding the nature of the controversy, it was possible, if not probable, that new counsel would be confronted with the same conflict. These factors, too, supported the trial court's denial of the motion to withdraw. See Baker v. State, 906 So.2d at 226-27. The trial court had a reasonable basis for denying the motion to withdraw. No abuse of discretion occurred, and Scott is not entitled to any relief on this claim.

V.
Scott next argues that the trial court erred when it found the § 13A-5-49(8), Ala.Code 1975, aggravating circumstancethat the crime was especially heinous, atrocious, or cruel as compared to other capital offensesto apply to the facts of this case. Specifically, Scott argues that the trial court's finding of that aggravating circumstance was capricious after the State declined to argue to the jury that the aggravating circumstance existed; that the trial court considered irrelevant factors when determining that this aggravating circumstance applied; and that the State failed to present sufficient evidence to prove that the circumstance existed. Scott is raising these issues for the first time; therefore, we review the claims for plain error only.
Rule 45A, Ala. R.App. P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
This Court has stated:
"`Plain error' has been defined as error `"so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings."' Ex parte Womack, 435 So.2d 766, 769 (Ala.1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). `To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So.2d 199, 209 (Ala. Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). This Court has recognized that the `"plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice *1083 would otherwise result.'"' Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App. 1993), aff'd, 651 So.2d 659 (Ala.1994), quoting United States v. Young, 470 U.S. 1, 15 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14 (1982)."
Eggers v. State, 914 So.2d 883, 890-91 (Ala. Crim.App.2004).
When determining whether a capital murder was "especially heinous, atrocious, or cruel," Alabama appellate courts continue to apply the standard set out in Ex parte Kyzer, 399 So.2d 330 (Ala.1981). See, e.g., Deardorff v. State, [Ms. CR-01-0794, June 25, 2004] ___ So.2d ___, ___ (Ala.Crim.App.2004). In Ex parte Kyzer, the Alabama Supreme Court held that the § 13A-5-49(8), Ala.Code 1975, aggravating circumstance applied "only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Ex parte Kyzer, 399 So.2d at 334. In Norris v. State, 793 So.2d 847 (Ala.Crim.App. 1999), this Court identified three factors that had often been considered by Alabama's appellate courts in determining whether the evidence established this aggravating circumstance. Factors that support a finding of this aggravating circumstance include physical violence beyond that necessary to cause death, appreciable suffering after a swift initial assault, and psychological torture. Norris v. State, 793 So.2d at 854-60. We have stated that psychological torture results when the victim is in intense fear and is aware of, but helpless to prevent, impending death. Ex parte Key, 891 So.2d 384, 390 (Ala.2004). Such torture generally must occur over an appreciable amount of time, prolonged enough to separate it from an "ordinary" murder. Norris v. State, 793 So.2d at 860-61.
Scott argues that the trial court's determination that the § 13A-5-49(8), Ala.Code 1975, aggravating circumstance existed was capricious because the State requested the trial court not to charge the sentencing jury on this aggravating circumstance and the trial court did not do so. Thus, the trial court found the aggravating circumstance to exist even though the jury did not consider whether this aggravating circumstance existed. The State correctly argues that Scott did not raise this objection at trial and that the failure to object limits our review to looking only for plain error. Alabama courts have rejected the claim that only the jury can determine whether an aggravating circumstance exists. E.g., Ex parte Hodges, 856 So.2d 936, 944-45 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181, 1188 (Ala.2002); Yeomans v. State, 898 So.2d 878, 897 (Ala.Crim.App. 2004); Lewis v. State, 889 So.2d 623, 703 (Ala.Crim.App.2003). No error occurred when the trial court found the existence of an aggravating circumstance that was not first submitted to the jury.[6]
Scott argues that the trial court relied on improper factors in determining that this aggravating circumstance applied in this case. In support of its determination that the § 13A-5-49(8), Ala. Code 1975, aggravating circumstance applied to this case, the trial court stated in its sentencing order:
"[T]he Court finds that the capital offense committed by the defendant was particularly heinous, cruel and atrocious compared to other capital offenses, in that the defendant showed no mercy to his ten year-old victim while he raped *1084 her, and/or attempted to rape her, and strangled and suffocated her. The defendant, without a doubt, committed a conscienceless and pitiless crime, which was clearly tortuous and painful to the victim. Additionally, the Court took into consideration the fact that the defendant never expressed genuine remorse for his actions, and he shouted to the victim's mother, in open court, that she had killed her own child."

(C. 76-77; emphasis added.)
Although he did not raise the objection at trial, we agree with Scott that the trial court could not properly consider his lack of remorse and his behavior at trial in determining whether this aggravating circumstance existed. Clearly, application of the § 13A-5-49(8), Ala.Code 1975, aggravating circumstance is to be based solely on the circumstances of the crime itself, and not on the trial court's perception of whether the defendant expressed remorse or on the defendant's behavior at trial. The trial court committed plain error when it relied on those factors. Although the harmless error rule applies in capital cases at the sentence hearing, Ex parte Whisenhant, 482 So.2d 1241, 1244 (Ala.1983), we decline to apply it here because the sentencing order contains additional errors, discussed infra, which necessitate a remand for further consideration of the sentence by the trial court.
"We are concerned that the trial court's basing the finding in part on the `status and person of the victim' and not solely on the circumstances of the murder may exceed the narrow interpretation of this aggravating circumstance that was adopted in Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), and that its judgment would not withstand the years of appellate review given a case in which the sentence is death. We do not mean to be understood as saying that the trial court's finding that the offense was especially heinous, atrocious, or cruel as compared to other capital offenses cannot be supported by the record. However, as we stated in Norris [v. State, 793 So.2d 847 (Ala.Crim.App.1999)], `it is imperative that we continue to use a "consistent and narrow interpretation" of this aggravating circumstance' in order to maintain the constitutionality of its application. 793 So.2d at 853. See also Ex parte Clark, 728 So.2d 1126 (Ala.1998). Therefore, we direct the trial court to consider only the narrow interpretation defining `especially heinous, atrocious or cruel' to include only `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim' as mandated by Ex parte Kyzer, when determining the existence or nonexistence of this aggravating circumstance."
Clark v. State, 896 So.2d 584, 596 (Ala. Crim.App.2000).
As in Clark, we direct the trial court on remand to rely on the relevant factors and apply the narrow interpretation of this aggravating circumstance adopted in Ex parte Kyzer, supra, in determining whether this aggravating circumstance exists.
Scott argues that the evidence was insufficient to support a finding that the murder was especially heinous, atrocious, or cruel. Specifically, he argues that the evidence presented at his trial did not support this finding because it established only that Latonya was asphyxiated; it did not establish that she was beaten, cut with a knife, or tortured in any way. While the cases discussing the heinous, atrocious, or cruel aggravating circumstance do not necessarily require that victim be beaten or cut, they do establish that this aggravating circumstance is to be applied narrowly and only to those conscienceless and pitiless murders that are unnecessarily *1085 torturous to the victims. We have held that factors such as physical violence beyond that necessary to cause death, appreciable suffering after a swift initial assault, and psychological torture are factors that can establish this aggravating circumstance.
Because we are remanding this cause for the trial court to eliminate improper factors from its consideration of the existence or nonexistence of this aggravating circumstance, as discussed above, we pretermit analysis and discussion of this claim. Additionally, we direct the trial court, as we did in Clark v. State, 896 So.2d 584, 596 (Ala.Crim.App.2000), to consider only the narrow interpretation defining especially heinous, atrocious, or cruel to include only those conscienceless or pitiless murders that are unnecessarily torturous to the victims, as mandated by Ex parte Kyzer, 399 So.2d 330 (Ala.1981), in determining whether this aggravating circumstance was established by the evidence. If the trial court finds that the evidence established the existence of this aggravating circumstance, the court is directed to make specific fact findings supporting its determination. We will review the trial court's determination on return to remand.

VI.
Scott next argues that the death-penalty statutes in Alabama and in all other states are unconstitutional under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He argues in a separate issue that the death penalty itself and Alabama's capital-sentencing scheme in particular are unconstitutional because, he says, they violate the prohibition in the Eighth Amendment against cruel and unusual punishment. The State correctly argues that Scott failed to raise these claims at trial; therefore, our review of the claims is for plain error only. We find no plain error.
We recently addressed and rejected a series of claims similar to the ones raised here. In Deardorff v. State, [Ms. CR-01-0794, June 25, 2004] ___ So.2d ___, ___ (Ala.Crim.App.2004), we stated:
"As for his claim that the death penalty constitutes cruel and unusual punishment, Alabama courts have often held otherwise. E.g., Martin v. State, 931 So.2d 736 (Ala.Crim.App.2003), and cases cited therein.
"The portions of the equal-protection and due-process claims that relate to state statutes other than Alabama's and to appellate review in federal courts and in state courts other than Alabama's are not matters within our jurisdiction to consider. Therefore, we do not address them.
"The equal-protection and due-process claims that relate to Alabama's statute and to Alabama's appellate court review are very general and contain no references to any particular portion of Alabama's statute or to the proceedings now under review. Deardorff's failure to include any specific claims of equal-protection or due-process violations precludes a finding of plain error.
"`Our analysis begins with the basic principle that a defendant who alleges an equal protection violation has the burden of proving "the existence of purposeful discrimination." Whitus v. Georgia, 385 U.S. 545, 550 (1967). A corollary to this principle is that a criminal defendant must prove that the purposeful discrimination "had a discriminatory effect" on him. Wayte v. United States, 470 U.S. 598 (1985).'
"McCleskey v. Kemp, 481 U.S. 279, 292 (1987)(footnote omitted).
"The same principle applies with regard to the examination of due-process *1086 claims. The United States Supreme Court stated what has become an oftcited principle, `A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights.' County Court of Ulster County, N.Y. v. Allen, 442 U.S. 140, 154-55 (1979).
"The State correctly argues that Deardorff has made no attempt to allege or prove a discriminatory intent or a specific due-process violation. His `boilerplate' allegations regarding alleged inequities, such as his conclusory statement that `the entire death penalty structure in this state and in this country is unconstitutional on its face and should be abolished as such' (Appellant's initial brief at p. 21),[7] do not establish that any of his rights to due process and equal protection were infringed. Thus, we find no plain error and hold that Deardorff is not entitled to relief on these claims."
Like the defendant in Deardorff, Scott has provided no references to any particular portion of Alabama's statute or to the proceedings now under review and he has failed to include any specific claims of equal-protection or due-process violations. His vague and conclusory allegations provide no basis for a finding of plain error. Scott is not entitled to any relief on these claims.

VII.
Scott next argues that Alabama's capital-sentencing scheme violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), for three reasons: the statute permits the sentencing judge to make the final fact findings and the findings regarding the aggravating circumstances and the mitigating circumstances; the statute does not require a unanimous finding as to each aggravating circumstance; and the statute permits the jury to recommend that the death sentence be imposed without first requiring a unanimous determination by the jury that the aggravating circumstances outweigh the mitigating circumstances. Scott raises these claims for the first time in this Court, so the claims are subject to review only for plain error. Each of these claims has been addressed and rejected by our appellate courts.
"In several recent decisions, both this Court and the Alabama Supreme Court have agreed with the State's rationale that Ring did not invalidate Alabama's law, which vests the ultimate sentence determination in the hands of the trial judge and not a jury. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala. 2002); Duke v. State, 889 So.2d 1, opinion on return to remand, 889 So.2d at 40 (Ala.Crim.App.2002); Turner v. State, 924 So.2d 737 (Ala.Crim.App.2002); Stallworth v. State, 868 So.2d 1128, 1178 (Ala.Crim.App.2001) (opinion on return to second remand)."
Miller v. State, 913 So.2d 1148, 1167-68 (Ala.Crim.App.2004)(opinion on return to remand).[8]
*1087 Because the claims Scott raises here have been rejected in previously decided cases, no plain error exists here, and Scott is not entitled to any relief on his claims.

VIII.
The State concedes that the trial court's sentencing order is flawed and that the case must be remanded for the order to be corrected. We agree. Section 13A-5-47(d), Ala.Code 1975, provides, in relevant part, that the sentencing court "shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52." The circuit court has not fully complied with this directive.
The State notes, first, that the trial court found as an aggravating circumstance that "[t]he capital offense was committed on an individual who was less than fourteen years of age." (C. 76.) As we stated in a similar case:
"This is not an aggravating circumstance defined in § 13A-5-49, Ala.Code 1975. We have held, `"A trial court may consider only those aggravating circumstances listed in § 13A-5-49 in fixing the death penalty. Clisby v. State, 456 So.2d 99 (Ala.Cr.App.1983); Berard v. State, 402 So.2d 1044 (Ala.Cr.App. 1980)."' Ponder v. State, 688 So.2d 280, 285 (Ala.Crim.App.1996) (quoting Bush v. State, 695 So.2d 70, 92 (Ala.Crim.App. 1995)). Accordingly, this aggravating circumstance was erroneously applied in this case."
Knight v. State, 907 So.2d 470, 483 (Ala. Crim.App.2004).
Therefore, on remand, we direct the trial court to omit this invalid circumstance from its consideration in determining Scott's sentence.
The State also notes that the court failed to make specific factual findings as to each statutory aggravating circumstance in § 13A-5-49, Ala.Code 1975, and each statutory mitigating circumstance in § 13A-5-51, Ala.Code 1975. The circuit court failed to make findings regarding the mitigating circumstance contained in § 13A-5-51(1), Ala.Code 1975, regarding whether Scott has a significant history of prior criminal activity. Furthermore, the court stated that it considered Scott's age, which is a statutory mitigating circumstance, but it did not state whether it found age to be a mitigating circumstance. On remand, we direct the court to clarify its finding on this circumstance.
In a listing of mitigating circumstances the court found not to exist, the court included, "Any other mitigating circumstance offered pursuant to § 13A-5-52, Code of Alabama 1975." (C. 77.) In the next paragraph of the sentencing order, however, the court stated, "The Court considered the evidence presented by the defendant as evidence of non-statutory mitigating factors." (C. 77.) Although the trial court need not list and make findings as to each item of alleged nonstatutory mitigating evidence offered by a defendant, Reeves v. State, 807 So.2d 18, 48 (Ala.Crim.App.2000), it must make a clear finding regarding the existence or nonexistence of nonstatutory mitigating evidence offered by a defendant. § 13A-5-47(d), Ala.Code 1975. The sentencing order is unclear as to whether the court found any nonstatutory mitigating circumstances to *1088 exist. On remand, this ambiguity must be clarified.
Finally, we note that the order states:
"The Court, in imposing sentence, has taken into consideration the recommendation of the jury, as well as the Department of Mental Health's findings that the defendant has no prior history of mental illness and that he is competent to stand trial, competent to assist his attorneys during trial, and was competent at the commission of the crimes herein, etc."
(C. 77-78.)
While § 13A-5-47(e), Ala.Code 1975, directs the court to consider the jury's recommendation in addition to the aggravating and mitigating circumstances it finds to exist, that section does not provide for consideration of the mental-health findings contained in the court's order as part of the sentencing determination. Although it is unclear whether or how the trial court's consideration of these additional findings influenced the court's decision as to the sentence imposed, we direct the court on remand to omit those factors from consideration as to the imposition of the sentence.

Conclusion
In summary, we must remand this cause for the trial court to amend its sentencing order. The trial court is directed to make findings as to and consider only those aggravating factors set out in § 13A-5-49, Ala.Code 1975. When considering whether the heinous, atrocious, or cruel aggravating circumstance exists, the trial court must consider only relevant factors, as defined in caselaw, and it must consider the facts presented at trial in light of the narrow interpretation of that aggravating circumstance established by federal and Alabama courts. If the court finds that aggravating circumstance to exist, it must support that determination with detailed fact findings. The court is further directed to address each mitigating circumstance set out in § 13A-5-51, Ala.Code 1975, and to clarify its findings regarding the existence of nonstatutory mitigating circumstances. Finally, in imposing sentence, the court is directed to comply with § 13A-5-47(e), Ala.Code 1975, and to consider only the factors listed therein.
If necessary, the trial court may reweigh the aggravating circumstances and the mitigating circumstances and resentence Scott. Due return should be made to this Court at the earliest possible time and within 42 days after the release of this opinion. We pretermit our complete plain-error review of this case and our review of the sentence pending the trial court's return to remand.
REMANDED WITH DIRECTIONS.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur.

On Return to Remand
COBB, Judge.
On February 25, 2005, we remanded this case for the trial court to amend its sentencing order to comply with the requirements of § 13A-5-47(d), Ala.Code 1975, and to correct several errors in the order. On remand, the trial court submitted a detailed sentencing order that complied with our instructions. We now address the propriety of Willie Earl Scott's convictions and his sentence of death.
Scott argues that, upon review of the proportionality of the sentence in this case pursuant to its duty under § 13A-5-53(b)(2), Ala.Code 1975, this Court should remand the case for the imposition of a sentence of life imprisonment without the possibility of parole. Scott contends that there is no evidence indicating that he is beyond rehabilitation and that this case *1089 "does not fit into the category of the most aggravated and unmitigated of most serious crimes." (Scott's brief at p. 38.) Scott did not raise this claim in the trial court. Nonetheless, we will address the propriety of the sentence pursuant to our mandatory review.
Section 13A-5-53(b) requires that, in analyzing whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Scott of the capital offenses charged in the indictmentmurder during the course of a rape or an attempt thereof and murder of a victim under the age of 14 yearsa separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and 13A-5-46, Ala.Code 1975. The jury heard the evidence concerning the aggravating circumstances and the mitigating circumstances. The trial court properly instructed it as to its role regarding the finding of any aggravating circumstance or circumstances and any mitigating circumstance or circumstances, the weighing of the aggravating and mitigating circumstances it found to exist, and the return of an advisory verdict. By a vote of 10-2, the jury recommended a sentence of death.
Thereafter, in accordance with § 13A-5-47, Ala.Code 1975, the trial court held another hearing to aid it in determining the appropriate sentence for Scott. Scott testified on his own behalf at this hearing. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b), Ala.Code 1975, for its consideration in determining the proper sentence. The trial court entered a thorough sentencing order on remand. That order included findings of fact summarizing the evidence presented at trial, specific findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each statutory mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and the nonstatutory mitigating circumstances it found to exist pursuant to § 13A-5-52, Ala.Code 1975.
The trial court found three statutory aggravating circumstances: that Scott had previously been convicted of a felony involving the use or threat of violence, § 13A-5-49(2), Ala.Code 1975; that the capital offense was committed while Scott was engaged in the commission of a rape or an attempted rape, § 13A-5-49(4), Ala. Code 1975; and that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A-5-48(8), Ala.Code 1975. The trial court included specific fact findings to support the § 13A-5-48(8) aggravating circumstance. The trial court found one statutory mitigating circumstanceScott's age, § 13A-5-51(7), Ala.Code 1975. The court found as nonstatutory mitigating circumstances all of the circumstances offered by Scott, including his mother's alcoholism and her inability to offer him the love he needed as a child, his loving relationship with his grandmother, the death of his younger sister, his artistic talent, and the fact that he had had sexual relationships with women of his own age.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances and that death was the appropriate sentence. The record does not reflect that the sentence of death was imposed as the result of the influence *1090 of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala. Code 1975. As required by § 13A-5-53(b)(3), Ala.Code 1975, we must determine whether Scott's sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. We find that it is not disproportionate or excessive. Scott committed a murder of a child under the age of 14 during the course of a rape or an attempted rape. Similar crimes have been punished by death throughout this State. E.g., Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001)(murder of child under 14 years old); Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003)(murder during course of a rape).
The trial court's findings are fully supported by the evidence presented. Scott argues that the trial court erred when it found the aggravating circumstance listed in § 13A-5-49(8), Ala.Code 1975, to exist. He did not raise this claim at trial, so we review it for plain error and in light of the applicable legal principles set forth in Part V of our opinion on original submission, 937 So.2d at 1082. The trial court entered specific findings of fact in support of its determination that the crime was especially heinous, atrocious, or cruel. The court found as follows in its order on return to remand:
"The capital offenses were especially heinous, atrocious or cruel compared to other capital offenses. Evidence presented in these cases was sufficient to prove that the ten-year (10) old victim was murdered `during' the commission of a rape or an attempt thereof. The word `during', as used in the definition of capital offenses means `in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or an attempt thereof'. Code of Alabama, 1975, § 13A-5-39(2). Although the autopsy of the victim revealed no evidence of trauma in the genitalia area, the evidence was sufficient to show that the element of `forcible compulsion' was present during the commission of the rape and/or the attempt thereof. As pointed out by the coroner, in his testimony, the victim had evidence of contusion, or bruising, to the lower lip. She had evidence in the whites of the eyes of petechiae, or small hemorrhageswhich can be a part of asphyxia, lack of oxygen. On her neck, there was an abrasion, or scratch, and beneath that, deeper, on the internal examination, she had evidence of extensive hemorrhage beneath the vocal cords; her larynx, her voice box. Additionally, she had probable hemorrhage in the mastoid areasthe little bumpy areas behind the ears. She also had swelling of the brain. The coroner went on to explain that when one stops venous return from the head, swelling of the brain is the result, and then there is a series ofa `cycle' that is lethal. He further testified that all of his findings would support his opinion that the victim died of asphyxia, from manual strangulation, and possibly also suffocation, as a mechanism. The totality of all of the circumstances provides ample evidence to support a finding of `forcible compulsion' as defined by law: `Physical force that overcomes earnest resistance or it is a threat, express or implied that places a person in fear of immediate death or serious physical injury to himself or another person.' Code of Alabama, 1975 § 13A-6-60(8). The Court is aware that this aggravating circumstance was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim, and that torture maybe [sic] found where the victim is subjected to serious physical, sexual, or psychological abuse before death. Further, the Court is aware that rape is considered to *1091 be a violent crime because it normally involves force, or the threat of force or intimidation, to overcome the will and the capacity of the victim to resist. It is very often accompanied by physical injury to the female and can also inflict mental and psychological damage. There is no doubt that the victim in these cases was murdered in such a way as to cause her great suffering before she died. This victim was not an adult, but a ten-year (10) old child, who was four feet five inches tall (4' 5") and weighed only sixty-four (64) pounds. Her assailant, on the other hand, a much larger and stronger nineteen-year-old (19) male, had been living in her home for at least one (1) month prior to the commission of these offenses. The evidence presented at trial showed that the child was physically abused and strangled to death during the course of, or in connection with, the commission of a rape or an attempt thereof. The nature of this vile and outrageously inhumane offense, without question involved fear and torture to this young child. Taking into consideration the timeframe within which these crimes must have occurred, which without a doubt, was not `instantaneous', the evidence presented supports the reasonable conclusion that, while the child was being strangled to death, she suffered greatly; (i.e., she had to be alive long enough for her brain to swell while being deprived of oxygen, and she had to feel the defendant's hands squeezing and crushing her throat while this was happening to her). She had to be alive long enough for the hemorrhaging to occur in her eyes and for the extensive hemorrhaging to occur in her neck, during which time she had to feel what was happening to her and experience intense fear. She certainly had to be alive when she received the injury and swelling to her lip, as noted by the coroner, because it is a medically proven fact that bruising or swelling will not occur postmortem. The coroner also stated that the trauma the child received to her lip was not due to strangulation. Therefore, this Court finds that this aggravating circumstance is not only warranted, but is fully justified in these cases."
We reject Scott's assertion that the court erred when it found the aggravating circumstance that the offense was especially heinous, atrocious, or cruel to exist. The evidence presented at trial, as set forth in the trial court's detailed findings, fully satisfied the standard set forth in Ex parte Kyzer, 399 So.2d 330 (Ala.1981), and its progeny. No plain error occurred, and Scott is not entitled to any relief on this claim.
We have independently weighed the aggravating circumstances against the statutory and nonstatutory mitigating circumstances, and we believe that the trial court correctly determined that the aggravating circumstances outweigh the mitigating circumstances, and we agree that death is the appropriate sentence in this case. In accordance with the mandate set forth in Rule 45A, Ala. R.App. P., we have searched the record for any error that may have affected Scott's substantial rights, and we have found none. Having performed our statutorily mandated review of the proceedings below, including our review for plain error and our review of the propriety of the death sentence, we conclude that Scott's convictions for capital murder and his sentence of death are due to be, and are now, affirmed.
AFFIRMED.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur.
NOTES
[1] One of the aunts, Icephen Goldthwaite, has a son, George, who is near Scott's age. "George Goldthwaite" was the name Scott gave when he was arrested for raping Landris Wright. That was also the name on the traffic citations issued to Scott while he was driving the stolen Lexus automobile.
[2] This Court acknowledges that Burton involved a dispute between the defendant and counsel that occurred during sentencing, while the dispute here involved witnesses who were called during the guilt phase. Nothing in Burton indicates that its holding was limited to disputes arising at sentencing. Moreover, our opinion in Moody v. State, 888 So.2d 532 (Ala.Crim.App.2003), is instructive; in Moody, this Court held that the doctrine of invited error prevented Moody from arguing on appeal that the trial court erred when it failed to appoint standby counsel because Moody objected before the trial began to the appointment of standby counsel. We held that the trial court's decision to honor Moody's expressed desires regarding his legal strategy at the guilt phase was not reversible error.
[3] Defense counsel stated that he was "renewing" the objection to consolidation, but we find no record of an objection prior to the first day of trial.
[4] Latonya Sager was 10 years old. Latrice Wright's date of birth is not in the record but she testified at the trial that she was 20 years old, and the trial was held three years after the crimes were committed. Therefore, she was approximately 17 years old at the time of the crime.
[5] We note that Scott continues to be represented on appeal by his lead defense counsel.
[6] Scott does not rely on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in his argument on this issue. However, to the extent Scott's argument implicates the principles discussed in Ring, we address those principles in Part VII of this opinion.
[7] Scott makes the same allegation at p. 31 of his brief.
[8] United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), holding that the statute making the Federal Sentencing Guidelines mandatory conflicted with Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), does not require reconsideration of our holdings in those cases. Booker reaffirms the holding in Apprendi, that any fact, other than a prior conviction, that increases the penalty beyond the statutory maximum authorized by the jury's verdict or a guilty plea must be submitted to the jury and proved beyond a reasonable doubt.